DeadtcRioK, Cb. J.,
delivered tbe opinion of tbe- court:
Bangess, executor of Archy*Partee, deceased, filed bis bill in tbe chancery court at Columbia, on tbe 24th of September, 1865, in which be alleges that be did, on tbe-day of-, 1865, suggest tbe insolvency of tbe estate of said Partee to tbe county court of Maury county.
Tbe bill further alleges that on tbe 25th of April, 1863, tbe testator sold and conveyed to one E. S. Jones, 300 acres of land, part of a tract of 500 acres lying in said county of Maury, at tbe price of $10,500; $10,000 of the price was paid at tbe time of tbe sale, and tbe purchaser’s note was taken for tbe $500 remaining unpaid, due January 1st, 1864; tbe $10,000 paid was Confederate money, and tbe $500 note is still due and unpaid.
it is further charged in tbe bill that said Jones, on 2'Tth'of August, 1863, sold and conveyed to defendant, T. H. Timmons, tbe said tract of 300 acres of land for $25,000 in Confederate money; and that said Timmons bad notice at tbe time of tbe sale and .conveyance to him, that $500 of tbe purchase money remained unpaid, 'and that a lien was subsisting upon the land, for it is insisted that lien *266 should be declared for the whole of tire price of said land, as the Confederate money paid was not a valid payment.
The bill also charges that a deed bearing date in 1861, but without attesting witnesses, was acknowledged by testator in October, 1863, conveying to his son’s (E. C. Par-tee’s) wife, Mary, the remaining 200 acres of the said 500 acre tract, for the- consideration, as expressed in the deed, of $7,500, but thac no consideration was, in fact, paid; and that said Mary has died, leaving her husband and an infant-child, Edward Partee, surviving her. It is charged that testator was, at the time of making these conveyances, in the year 1863, about 70 years of age, feeible in mind and incapable of managing or disposing of his estate.
It is further shown by the bill, that in 1861, the Union Bank obtained judgment in the circuit court of Maury county, against testator, for about the sum of $3,500, which were taken by appeal to the supreme court, and were still pending and undetermined in said court.
The bill further charges that if the claims for the land, etc., be realized, the estate will be solvent, but if -any considerable part of the same should not be realized, then the estate will be insolvent; that the personal estate left is of small value.
The widow, heirs, and creditors of testator are made defendants, and also the infant- son and heirs-at-law of said Mary Partee, and the Union Bank in enjoined from prosecuting said suits pending in the supreme, court; and all the creditors are in like manner enjoined by the fiat of the chancellor upon the said 23d of December, 1865, except that the Union Bank was allowed to prosecute its suit in the supreme court to an affirmance of its judgments, but was enjoined from issuing executions until the further order of the chancellor.
Judgment pro -confesso was- taken against Jones; Tim-mons answered and admitted that he purchased the land of Jones and paid for it, with knowledge that $500 of the purchase money was still due from Jones, and does not *267 contest that tliat sum'constitutes a lien upon the land. But he says that testator owed him at the time of his death more than $500, and claims the right to set off his claim on testator against the amount remaining due from Jones for the land. Timmons also states in his answer that before the bill was filed he sold and conveyed the said tract of 300 acres of land to his son, J. K. P. Timmons, for a valuable consideration.
E. C. Partee, the son of testator, and husband of Mary, states in his answer, that down to some time in 1863, testator had means sufficient to pay his debts, and became insolvent by loss of his slave property.
He states that in 1859, testator proposed to him to take 150 acres of his land at $35 per acre; that he declined to do so, whereupon testator urged him to* take it, saying he could pay for it when it suited him, and if he never paid for it it would make no difference to him. Respondent accepted the proposition, regarding it as an advancement to him; no conveyance was then made.
In 1861, the proposition was made by testator that if respondent and his wife, Mary, would give him a power of attorney to draw the money due said Mary from her father’s estate, he would retain $2,000.of it, and in consideration thereof, he would make her a deed to 150 acres of the land.
The power of attorney was executed, but no money was ever received upon it After this, respondent alleges that he paid his father $2,400 in Confederate money, upon his agreeing to make title to the 150 acres.
The deed acknowledged October, 1863, was made for 200 acres instead of 150; respondent states that he does not know why this was done unless it was for the $400 paid over and above the $2,000, but insists that he paid $2,000 for the 150 acres, and that this was all he claimed therefor; and that the 50 acres additional conveyed was either intended as a consideration for the $400, or as a voluntary gift.
*268 Tbe Union Bank also answered the bill, and files its answer as a cross-bill, making tbe parties to tbe original bill and J. X. P. Timmons, tbe purchaser of tbe 300 acre tract, defendants, insisting on tbe lien of its judgments and praying tbe court to order tbe sale of tbe land to enforce said liens, and to tbai extent to modify tbe injunctions granted.
Bangess, tbe executor, filed an amended bill making J. K. P. Timmons defendant, and alleging that his father, S. Tl. Timmons, about tbe time of tbe filing of tbe original bill, fraudulently conveyed tbe 300 acres of land to said J. X. P. Timmons; that tbe son was a young man without means, living with bis father, and knew that the land was not paid for and that be bad not paid for it.
J. K. P. Timmons in bis answer admits that be purchased of bis father tbe 300 acres of land and took a conveyance of it 10th of September, 1865; that be agreed to give $12,000 for it in five equal annual installments; be denies fraud, but admits that be has not paid anything for tbe land, and does not deny that be had knowledge that $500 of tbe purchase money was due from Jones for tbe land.
In the supreme court, tbe testator having died in November, 1863, tbe suits of tbe Union Bank were revived against Bangess, tbe executor, and judgments of the circuit court were affirmed February 2, 1866.
Upon these judgments executions were issued 26th of March, 1866, and returned not satisfied. At October term, 1868, tbe chancellor rendered a decree setting aside tbe conveyances to Jones and to Mary Partee, upon the ground that tbe deeds were not properly stamped, and because having been paid for in Confederate money, they were not executed uuou any valid or legal consideration.
The chancellor directed that accounts of the rents and profits should be taken, and tbe parties in possession should be charged therewith, and that an account of tbe assets and debts of testator be taken, and also directed that tbe parties in possession ot said land should be dispossessed, and *269 that the master should sell the same for the payment of testator’s debts, and,that the Union Bank was not entitled' to priority of satisfaction of its judgment out of the lands over the other creditors of the estate holding claims by notes or accounts.
Prom this decree, S. H. Timmons and J. K. P. Timmons, Allen, trustee for the Union Bank, and S. C. Partee, Jr., have appealed to this court.
The decree is erroneous in setting aside -the conveyance of the lands for the reasons stated therein. It has been repeatedly held that the want of revenue stamps does not affect the validity of the conveyance, and quite as often decided by tins court that Confederate money, voluntarily and understandingly accepted by a vendor, is a valuable consideration, and will support a conveyance of land or transfer and sale of personalty.
The conveyance to Jones was free from fraud on his part as well as on the part of testator. He was perfectly competent to contract'; indeed, there is no proof in the record to raise any suspicion of the competency of testator at the time of the execution or acknowledgment of either of the deeds in question.
The lien for the $500 of unpaid purchase money of the tract sold to J ones still subsists upon the land. It is shown satisfactorily that it was intended to be retained at the time of the sale; and S. H. Timmons admits his knowledge of its existence at the time he bought land of Jones, and does not controvert its validity. And it is most probable J. K. P. Timmons knew of its existence when he took the conveyance from his father. At all events, he does not deny knowledge of it, although it is expressly charged; and he furthermore admits that he has not paid any part of the price of said land. He does not and could not rely upon the plea of innocent purchaser. S. H. Timmons cannot set off any debts he may have against testator’s estate, against the debt due for purchase money.
The debt for purchase money is due from Jones, and *270 is a lien upon the land, and S. H. Timmons does not owe the debt, and sets up no claim to the laud, having conveyed it to his son.
The conveyance to Mary Partee of the 200 acres, according to the statement of her husband, Ed O. Partee, seems to have been made for little or no consideration. He states that in 1859, his father urged him to accept a conveyance of 150 acres of the tract; at a later period he agreed with his father to taire a deed for 150 acres, and to give him a power of attorney to draw $2,000 to pay for it from his wife’s father’s estate. The power of attorney was executed, but no money was ever drawn upon it and no conveyance was executed for the land until in the summer of 1863, a deed was made to the wife of the son for 200 acres, being the remainder of the 500 acres left after the sale of the 300 acres of Jones.
The deed is dated 6th of January, 1860, but is shown to have been wnitten and executed orne time in 1863, and after the deed was executed to Jones and registered, and purports upon its face to have been executed for the sum of $7,500 paid to the ¡maker or bargainor.
The consideration actually paid, according to the son’s statement, was $2,000 in Confederate money, for 150 acres, but he alleges that he paid his father $2,400 in Confederate money, and he supposes the 50 acres over and above the 150, was conveyed in consideration of the $400 paid over the stipulated price of $2,000.
The land is shown to have been worth $35 per acre, and if the proof were full and satisfactory as to the payment of the $2,400, the sale could not be sustained under the cir7 cumstances of this case.
Without the proceeds of the 200 acres of land the estate would be insolvent; with them and the other assets there will most probably be a sufficient- amount to pay the debts.
The testator, it appears incidentally, had some slaves, but it is manifest that at the time the conveyance was made *271 of tbe 200 acres of land, sncb property was held in that locality by a very insecure and uncertain tenure!
It also appears that about the time of the alleged payment to testator of the $2,400, the son, Ed. C., received for his father, from the sale of cotton, upwards of $2,400 in Confederate money, which he'admits he did not pay over to' him.
We are therefore of opinion that the conveyance of the 200 acres was made under such circumstances as that it cannot be permitted to prevail against the rights of creditors; and especially must such conveyance be held invalid as against the judgments of the Union Bank. These judgments were obtained in the lifetime of testator, in the circuit court of the county in which the lands are situated, and where the debtor resided at the time of their rendition, and were a lien upon his land from the time they were rendered. Code, sec. 2980. Appeals were taken to the supreme court. This did not release the liens, but merely suspended their enforcement.
When there is no impediment to issuance of an execution, the lien exists for twelve months only from the rendition of the judgment. Code, 2982.
But if the sale within twelve months is prevented by injunction, writ of error, appeal in the nature of a writ of error, or other adverse proceeding in court, the lien continues, provided the creditor sells within one year from the removal of such obstruction (Code, 2983), and a sale made within a year after the removal of restraining process of the court, overreaches and avoids all intermediate aliena-tions made by the judgment debtor. 1 Swan, 518; 8 Yer., 459; 5 Hum., 304.
In this case, which arose under the act of 1831, ch. 90, and which is not as comprehensive as sec. 2983 of the Code, the court held that a party prevented by process of law from effectuating his lien, should have a year within which to sell after the obstruction was removed.
Nor do we think that the issuance of executions upon *272 the affirmance of the judgments in the supreme court against the executor and the sureties on the appeal bond, which were not levied nor satisfied, operated as a waiver of the judgment lien.
The executions may have been issued by the clerk without instructions from the plaintiff, under and by virtue of the mandatory provisions of sec. 3003 of the Oode, requiring him, to issue executions within sixty days after the adjournment of each term of the court. Or they may have been issued inadvertently by plaintiff’s order. If done wil-fully, such violation of the injunction would subject the party to liability to punishment for contempt, but would not affect the legal consequences of the judgments, nor impair his rights under them.
But it is insisted that the bill in this case is filed as an insolvent bill, and that the filing of such a bill displaces the lien of the judgments acquired in the lifetime of deceased, and preserved, as we have seen, by sec. 2983 of the (Jode, and puts the judgment creditor upon the same footing as all other creditors. Oode, 232(3. That statute was not intended to affect liens acquired in the lifetime of the insolvent deceased debtor. The act was designed merely to abolish the preference which existed a,t common law, but not to affect any lien acquired in the lifetime of deceased. 4 Hum., 368; 1 Sneed, 354; 3 Head, 361.
The allegations of the bill is, that if the sale of the lands is set aside the estate will be solvent, otherwise it will be insolvent. The debts due the Union Bank constitute the larger proportion of the indebtedness of the estate, and after the satisfaction of the lien of the bank by the sale of the land, it may turn out that sufficient assets may be realized to pay the debts. Be this as it may, we hold that the Union Bank has still a valid, subsisting lien upon the whole of the land for the satisfaction of the judgment in its favor, and these liens must be satisfied out of the 200 acres conveyed to Mary Partee in the first instance, the sale and conveyance to her, being, in our opinion, fraudu *273 lent as against testator’s creditors, and must be set aside, and if the proceeds of t-lie sale thereof is more than sufficient to pay the debts due the Union Bank, the residue will be distributed among such of the creditors as may have established their claims. If the sale of the 200 acres does not yield a sufficient sum to pay the bank debt, then the land sold to J ones by testator, being the 300 acres now claimed by J. II. P. Timmons, or so much thereof as may be sufficient for the purpose, shall be sold to make up the deficit; and said 300 acres, or sufficiency thereof, shall be sold to pay the $500 and interest of unpaid purchase money on such terms as may be prescribed by the chancellor, for which it is liable.
The decree of the chancellor is reversed, and a decree will be entered here in c.onfoimity with this opinion, and the cause will be remanded to the chancery court for the execution of the decree of this court, and for such other and further proceedings and accouuts as may be necessary to a complete and final settlement of the rights and equities of the parties. One-half the cost will be paid by the executor out of the funds of the estate, and the other half will be paid equally by S. TI. and J. II. P. Timmons.